### In re DOUBLE EAGLE CONSTRUCTION, INC., Debtor.

**Bankruptcy No. 95/41763.**

United States Bankruptcy Court, W.D. Missouri.

Sept. 29, 1995.

Order Denying Reconsideration Nov. 7, 1995.

Gene A. DeLeve, Berman, DeLeve, Kuchan & Chapman, Kansas City, MO, for Debtor.

James F.B. Daniels, Daniels & Kaplan, P.C., Kansas City, MO, for Imperial Premium Finance.

## MEMORANDUM OPINION

ARTHUR B. FEDERMAN, Bankruptcy Judge.

Creditor Imperial Premium Finance, Inc. ("Imperial") moved this Court to Prohibit

Use of Cash Collateral and for Relief from the Automatic Stay Or, in the Alternative for Adequate Protection. At a preliminary hearing conducted on this matter on August 21, 1995, debtor raised the issue of whether Imperial's security interest in unearned premiums was perfected. The parties filed briefs on the issues of perfection and adequate protection payments at the final hearing conducted on September 7, 1995. This is a core proceeding under 28 U.S.C. § 157(b)(2)(G) and (K) over which the Court has jurisdiction pursuant to 28 U.S.C. §§ 1334(b), 157(a), and 157(b)(1). For the reasons set forth below, I find the following: (1) Imperial has a perfected security interest; (2) Imperial's Motion for Relief from the Automatic Stay is Denied; and Imperial's alternate motion for adequate protection is Granted.

## FACTUAL BACKGROUND

Debtor Double Eagle Construction, Inc. ("Double Eagle") is required to carry workman's compensation insurance. Mo.Stat. Ann. §§ 287.030 and 287.280 (1993). The Robert E. Miller Agency of Kansas City, Missouri arranged for such insurance with Lumberman's Mutual Casualty Company ("Lumberman's"). Lumberman's agreed to provide workman's compensation coverage to Double Eagle provided it paid the entire premium in the amount of $176,604.00 in advance of coverage. Double Eagle paid $44,151.00 to Lumberman's and sought to borrow the remaining premium balance of $132.453.00. To that end, Double Eagle entered into a Commercial Premium Finance Agreement (the "Finance Agreement") with Imperial on May 9, 1995. The Finance Agreement provides that Imperial loan Double Eagle the total sum of $137.371.92, secured by a security interest in any and all unearned premiums. Double Eagle agreed to repay the loan in nine equal monthly installments of $15,215.67 commencing June 10, 1995. The Finance Agreement also provides that Double Eagle appoint Imperial as its attorney-in-fact with full authority to cancel the insurance policy for nonpayment of principal and receive all unearned premiums assigned to Imperial. Double Eagle sent a check to Imperial on June 10, 1995, in the amount of $15,215.67, but that check was returned for insufficient funds. On June 30, 1995, Imperial informed Lumberman's that Double Eagle had assigned "any and all unearned premiums and dividends which may become payable" under the worker's compensation policy, and that it had appointed Imperial as attorney-in-fact with authority to cancel the policy upon default. The payment due on July 10, 1995, was not paid. Double Eagle filed a Chapter 11 bankruptcy petition on July 13, 1995.

Imperial moved this Court to lift the automatic stay and allow it to cancel the workmen's compensation insurance policy and realize on the remaining unpaid premiums. Imperial claims that the worker's compensation insurance actually costs $483.85 per day, thus, Imperial's collateral is eroding at the rate of $483.85 per day. By Imperial's calculations, Double Eagle had eroded any equity it had in the policy by virtue of the initial advance premium payment of $44,151.00 on August 9, 1995, thus Double Eagle has no equity in the collateral. Following the preliminary hearing held on August 21, 1995, this Court entered an Order continuing the automatic stay and required debtor to pay the sum of $10,524.10 to Imperial on or before August 31, 1995, as an adequate protection payment. A final hearing was held on September 7, 1995, to address the issue of perfection and additional adequate protection payments.

Double Eagle first raised the issue of perfection at the conclusion of the hearing on August 21, 1995. Debtor makes four arguments. First, debtor claims Imperial did not perfect its security interest in unearned premiums at the time the Finance Agreement was executed. Second, debtor claims if Imperial's letter to Lumberman's served to perfect said security interest, such perfection was a preference. Third, debtor claims Imperial was not registered to conduct business in Missouri at the time of the Finance Agreement. Fourth, if this Court finds the security interest is perfected, debtor claims it has offered adequate protection to Imperial.

Imperial argues that a security interest in unearned insurance premiums is perfected upon creation, therefore, debtor's other argu-

ments are moot. I will first address both parties' perfection argument.

### DISCUSSION

■ Both Imperial and Double Eagle agree that premium finance agreements are common commercial transactions. Docs. ## 88 and 90; *Borg–Warner Credit Corp. (In re RBS Industries, Inc.),* 67 B.R. 946, 950 (Bankr.D.Conn.1986). Likewise, the parties agree that in Missouri Article 9 of the Uniform Commercial Code ("UCC") does not apply to the "transfer of an interest or claim in or under a policy of insurance." Mo.Stat. Ann. § 400.9–104(g) (1994); *In re Smith,* 167 B.R. 895, 898 (Bankr.E.D.Mo.1994); *In re Watts,* 132 B.R. 31, 32 (Bankr.W.D.Mo.1991). Missouri, however, has adopted a specific statute which covers premium finance companies. Mo.Stat.Ann. § 364.100–.160 (Supp. 1995). A premium finance company is defined by statute as "a person engaged in the business of entering into premium finance agreements or acquiring premium finance agreements from other premium finance companies." Mo.Stat.Ann. § 364.100(4) (Supp.1995). A company seeking to engage in the business of premium finance in Missouri must register with the director of the division of finance. Mo.Stat.Ann. §§ 364.100(1) and 364.105(1) (Supp.1995). Section 364.140 further provides:

> No filing of the premium finance agreement shall be necessary to perfect the validity of such agreement as a secured transaction as against creditors, subsequent purchasers, pledgee, encumbrancer, *trustees in bankruptcy* or any other insolvency proceeding under any law, or anyone having the status or power of the aforementioned or their successors or assigns.

Mo.Stat.Ann. § 364.140 (Supp.1995) (emphasis added). The plain language of this statute notwithstanding, debtor argues that the common law doctrine of notice is still required to "make the assignment of a right to payment or other kind of general intangible effective and binding against subsequent assignees or judgment lien creditors of the assignor." Doc. # 107. In other words, debtor argues that the security interest taken by Imperial was not perfected until notice of such security interest was given to Lumberman's, that such notice was given after the loan was made, and that such notice was given during the preference period. Debtor does not cite a Missouri case which holds that the common law doctrine of notice abrogates the effect of a specific statute, nor could this Court find such a case. The Court, however, did find a case which holds that an insurance insolvency statute prevails over the common law doctrine of novation. *William Blair Realty Partners v. Transit Casualty Co. (In re Transit Casualty Co.),* 900 S.W.2d 671, 675 (Mo.Ct.App.1995). *See also Mediq PRN Support Serv., Inc. v. Abrams,* 899 S.W.2d 101, 110 (Mo.Ct.App. 1994) (citing *Derboven v. Stockton,* 490 S.W.2d 301, 314 (Mo.App.1972) and Mo.Stat. Ann. § 1.010) (1969)) [1] (holding that the state legislature has authority to override the common law of the state). In *Transit Casualty Co.* the Court held that "[t]he statutory scheme for receivership in liquidation of an insurance company ... sets up a self-contained and exclusive statutory scheme ... and the trial court must administer the insolvent estate in accordance with these statutory provisions." *Id.* Chapter 364 of Missouri's Revised Statutes also sets up a self-contained statutory scheme governing premium finance companies. As such, I find that section 364.140 perfects a security interest in unearned premiums upon creation of such security interest and controls over any common law doctrine of notice.

---

1. Section 1.010 provides:

 The common law of England and all statutes and acts of parliament made prior to the fourth year of the reign of James the first, of a general nature, which are not local to that kingdom and not repugnant to or inconsistent with the Constitution of the United States, the constitution of this state, or the statute laws in force for the time being, are the rule of action and decision in this state, any custom or usage to the contrary notwithstanding, but no act of the general assembly or law of this state shall be held to be invalid, or limited in its scope or effect by the courts of this state, for the reason that it is in derogation of, or in conflict with, the common law, or with such statutes or acts of parliament; but all acts of the general assembly, or laws, shall be liberally construed, so as to effectuate the true intent and meaning thereof.

This finding essentially moots debtor's second argument that the letter of June 30, 1995, was an avoidable preference because it perfected Imperial's security interest within ninety days of the bankruptcy petition. 11 U.S.C. § 547(b).

■■■ Section 547(c) of the Bankruptcy Code provides in relevant part that:

(c) The trustee may not avoid under this section a transfer—

(1) to the extent such transfer was—

(A) intended by the debtor and the creditor to or for whose benefit such transfer was made to be a contemporaneous exchange for new value given to the debtor; and

(B) in fact a substantially contemporaneous exchange.

11 U.S.C. § 547(c)(1).[2] The parties do not dispute that there was a contemporaneous exchange when Double Eagle and Imperial executed the Finance Agreement. In fact, Double Eagle has not attempted to avoid the initial transaction as a preference. Since Imperial's security interest was perfected contemporaneously with execution of the Finance Agreement, section 547(b) is inapplicable.

■■■ Debtor further questions whether Imperial was registered to conduct business in the State of Missouri at the time of this transaction. Imperial's Certificate of Registration, issued by the State of Missouri, pursuant to Chapter 364 of Missouri Revised Statutes, indicates the certificate was issued on June 22, 1995. It is not possible to determine from the face of the certificate the date of Imperial's initial registration with the state. The Director of Finance's office verified for this Court, however, that Imperial was registered to conduct business in the State of Missouri no later than December of 1994.

For all of the above reasons, I find that Imperial has a perfected security interest in the unearned premiums.

■■■ I will now discuss Imperial's alternative motion for adequate protection payments. This is a liquidating Chapter 11 bankruptcy. Debtor is a construction company with a number of projects under construction. All of the projects are scheduled to be completed on or about October 31, 1995. Double Eagle has persuaded this Court previously that it is in the best interest of all parties to allow debtor to complete said projects. For this reason, Imperial's Motion to Lift Stay will be DENIED. However, since there is no dispute that Imperial's collateral, by its very nature, is depreciating, Imperial is entitled to adequate protection payments. 11 U.S.C. § 362(d)(1). I found at the preliminary hearing on this matter that debtor was consuming Imperial's collateral at the rate of $483.85 a day. Double Eagle had equity in the unearned premiums in the amount of $44,151.00. That equity was consumed by August 9, 1995. As of August 31, 1995, debtor had consumed $54,675.05 of the unearned premiums, and of that figure, $10,524.05 was Imperial's collateral. I, therefore, required Double Eagle to make one adequate protection payment in the amount of $10,524.05 by August 31, 1995.

Double Eagle now argues that the work force has decreased as construction projects are completed, therefore, debtor is not consuming the unearned premiums at the rate of $483.85 per diem. Debtor proposes an adequate protection payment of $6,410.10, payable in weekly installments, for the month of September, 1995, and adequate protection payments throughout October and into November, based upon a per diem payment equal to that proportionate part of $483.85 which the actual weekly payroll bears to $36,231, the weekly payroll at the time the policy was obtained.

Double Eagle did not submit the insurance policy to this Court. The only contract which is a part of this record is the Finance Agreement. Doc. # 88, Ex. A. From the Finance Agreement, this Court found previously that Imperial's collateral is being con-

---

2. Pursuant to § 1107(a) of the Bankruptcy Code, and with certain exceptions not relevant here, debtors-in-possession are granted the rights and powers of a bankruptcy trustee. 11 U.S.C. § 1107(a); *Capen Wholesale, Inc. v. Michael (In re Capen Wholesale, Inc.)*, 184 B.R. 547, 549 n. 2 (N.D.Ill.1995).

sumed at the rate of $483.85 per day. Therefore, debtor should make an adequate protection payment to Imperial on or before October 6, 1995, in the amount of $17,418.60, which is the value of Imperial's collateral consumed since August 31, 1995. Debtor will, thereafter, make weekly adequate protection payments to Imperial in the amount of $3,386.95 until such time as all construction projects are completed, at which time the automatic stay will be lifted and Imperial authorized to cancel the worker's compensation policy and realize on its collateral. In the event debtor fails to make any payment when due, the automatic stay is lifted to allow Imperial to take all steps necessary to cancel such policy and realize on its collateral.

*ORDER DENYING DEBTOR'S MOTION TO RECONSIDER, ALTER AND AMEND MEMORANDUM OPINION AND ORDER FILED SEPTEMBER 29, 1995*

Double Eagle Construction, Inc. ("debtor") asks this Court to reconsider its Order of September 29, 1995, which held the following: (1) Imperial Finance, Inc. ("Imperial") had a perfected security interest in unearned premiums; (2) Imperial's motion to lift stay was denied; and (3) Imperial was entitled to adequate protection equal to the erosion of its collateral in the amount of $483.85 per day. Said motion is denied.

■ Debtor's first argument is that the amount required as adequate protection is not supported by the evidence and is excessive. This Court found in its Memorandum Opinion of September 29, 1995, that:

there is no dispute that Imperial's collateral, by its very nature, is depreciating, [therefore,] Imperial is entitled to adequate protection payments. 11 U.S.C. § 362(d)(1). I found at the preliminary hearing on this matter that debtor was consuming Imperial's collateral at the rate of $483.85 a day. Double Eagle had equity in the unearned premiums in the amount of $44,151.00. That equity was consumed by August 9, 1995. As of August 31, 1995, debtor had consumed $54,675.05 of the unearned premiums, and of that figure, $10,524.05 was Imperial's collateral. I, there-

fore, required Double Eagle to make one adequate protection payment in the amount of $10,524.05 by August 31, 1995. Double Eagle now argues that the work force has decreased as construction projects are completed, therefore, debtor is not consuming the unearned premiums at the rate of $483.85 per diem. Debtor proposes an adequate protection payment of $6,410.10, payable in weekly installments, for the month of September, 1995, and adequate protection payments throughout October and into November, based upon a per diem payment equal to that proportionate part of $483.85 which the actual weekly payroll bears to $36,231, the weekly payroll at the time the policy was obtained ... The only contract which is a part of this record is the Finance Agreement. Doc. # 88, Ex. A. From the Finance Agreement, this Court found previously that Imperial's collateral is being consumed at the rate of $483.85 per day. Therefore, debtor should make an adequate protection payment to Imperial on or before October 6, 1995, in the amount of $17,418.60, which is the value of Imperial's collateral consumed since August 31, 1995. Debtor will, thereafter, make weekly adequate protection payments to Imperial in the amount of $3,386.95 until such time as all construction projects are completed, at which time the automatic stay will be lifted and Imperial authorized to cancel the worker's compensation policy and realize on its collateral.

Doc. # 109. Debtor now asks this Court to admit the insurance policies from Lumberman Mutual Casualty Company ("Lumberman's") which purport to support debtor's argument that the unearned premiums are consumed in a direct relationship to the weekly payroll, that the weekly payroll at the time the policy was executed was $36,231.00, that the weekly payroll is currently substantially less than $36,231.00, and that adequate protection payments throughout October and into November should be based upon a per diem payment equal to that proportionate part of $483.85 which the actual weekly payroll bears to $36,231. The insurance policies attached to debtor's motion as exhibits

## 11 and 12 do indicate that the premiums were calculated in part upon debtor's annual payroll. However, the policies themselves do *not* state that the premiums will be adjusted if the payroll changes. In fact, the original policy states "THE PREMIUM FOR THIS POLICY WILL BE DETERMINED BY OUR MANUALS OF RULES, CLASSIFICATIONS, RATES, AND RATING PLANS." Doc. # 127, Ex. 10. The policy also states that the information regarding premiums "is subject to verification and change by audit." *Id.* Debtor did not submit the Manual of Rules, Classifications, Rates, and Rating Plans from Lumberman's. Debtor has still not offered evidence sufficient to refute Imperial's evidence that its collateral is depreciating at the rate of $483.85 per day. Therefore, as to adequate protection, the motion to reconsider must be denied.

 Debtor also argues yet again that Imperial's security interest in unearned premiums has not been fully and properly perfected. I found in the Memorandum Opinion of September 29, 1995, that Imperial and debtor entered a premium finance agreement, that Missouri has adopted a specific statute which covers premium finance companies, and that the specific statute determines perfection of a security interest in unearned premiums. Doc. # 109; Mo.Stat.Ann. § 364.100–.164 (Supp.1995). Section 364.140 deals with perfection and provides:

> No filing of the premium finance agreement shall be necessary to perfect the validity of such agreement as a secured transaction as against creditors, subsequent purchasers, pledgees, encumbrancers, trustees in bankruptcy or any other insolvency proceeding under any law, or anyone having the status or power of the aforementioned or their successors or assigns.

Mo.Stat.Ann. § 364.140 (Supp.1995). The plain language of this statute notwithstanding, debtor continues to argue that section 364.140 dispenses with the requirement for filing, but does not dispense with the necessity of complying with the common law notice requirement. Debtor now relies on a recent opinion by the Honorable Frank W. Koger

for this premise. *Sam Brown Company v. Allied Products Corp. (In re Sam Brown Co.)*, Adv. No. 95–4072, Case No. 95–40580. It is true that Judge Koger was required to determine whether a claimant had a perfected security interest in the proceeds of a judgment under the common law. Judge Koger made that decision after first finding that the security interest was outside the purview of an article 9 security interest, and after finding no other statute in either Missouri or Kansas which dealt with a right represented by a judgment. *See* Mo.Stat. Ann. § 400.9–104(h) (1994). There is, however, a specific statute which controls perfection of a security interest in unearned insurance premiums. Mo.Stat.Ann. § 364.140 (Supp.1995). In fact, Judge Koger has previously held that a security interest in unearned insurance premiums is perfected upon creation. *See In re Watts*, 132 B.R. 31, 32 (Bankr.W.D.Mo.1991). The quoted Missouri statute recognizes that debtors should be bound by their obligations to make payments to those who finance insurance which remains in force. The purpose of filing statutes is to give notice to creditors that a debtor's assets are encumbered prior to an extension of credit based upon those same assets. The Legislature has determined that such notice is not necessary as to premium finance agreements. If, after finding that notice by filing is not necessary the Legislature had seen fit to substitute some alternate form of notice, it certainly could have done so. I find, pursuant to section 364.140 of Missouri's Revised Statutes, that no notice was necessary to perfect Imperial's security interest in unearned premiums. Since *Sam Brown* dealt with a situation in which there was no controlling statute, the common law doctrine of notice was applicable there. However, that case is not on point here.

For all of the above reasons, debtor's Motion to Reconsider, Alter and Amend Memorandum Opinion Filed September 29, 1995, and any Order Entered Thereon is DENIED.

IT IS SO ORDERED.